UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                              :
GELLER BIOPHARM, INC.,                                        :
                                                              :
                                        Plaintiff,            :          20 Civ. 4334 (JPC)
                                                              :
              -v-                                             :          OPINION AND ORDER
                                                              :
AMUNIX PHARMACEUTICALS, INC.,                                 :
                                                              :
                                        Defendant.            :
                                                              :
------------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

Plaintiff Geller Biopharm, Inc. ("Geller") was hired by Defendant Amunix Pharmaceuticals, Inc. ("Amunix") to provide advisory and consulting services. Pursuant to its contract with Amunix, Geller negotiated a feasibility study between Amunix and a third party, F. Hoffman-La Roche Ltd. and Hoffman-La Roche Inc. (collectively "Roche"). Over a year after Amunix terminated its consulting contract with Geller, Amunix and Roche entered into a licensing agreement. Amunix refused to pay Geller a transaction fee in connection with that licensing agreement. As a result, Geller sued Amunix for breach of contract, alleging it is due a fee for the licensing agreement since that agreement built upon the feasibility study. In the alternative, Geller alleges that Amunix breached the implied covenant of good faith and fair dealing by waiting until after their consulting contract ended to close the licensing deal. Before the Court is Amunix's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, the Court grants Amunix's motion to dismiss and dismisses this case with prejudice.

## I.   Background

### A.  Factual Allegations

Except as otherwise noted, the following facts, which are assumed true for purposes of this Opinion and Order, are taken from the Complaint and from the documents attached thereto.  Dkt. 4 ("Compl."); *see Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (noting that at the motion to dismiss stage, a court may consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference" as well as any documents "integral" to the complaint, *i.e.*, "where the complaint 'relies heavily upon [the document's] terms and effect'" (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995))).

Geller provides advisory, consulting, and investment banking services to companies in the biopharmaceutical industry.  Compl. ¶ 7.  Amunix is a pharmaceutical company that developed and owns XTEN, a technology platform that extends the half-life of therapeutics.  *Id.* ¶ 8, Exh. E ("Jan. 10, 2020 Press Release").  Amunix first retained Geller in 2016 to advise and assist Amunix with regard to partnering, collaboration, and licensing agreements with pharmaceutical companies.  Compl. ¶ 13, Exh. B ("2016 Advisory Agreement").  At the time Amunix first retained Geller, Amunix already had a feasibility study underway with Roche ("First FSA").  Compl. ¶ 14.  Pursuant to the First FSA, which began in 2013, Roche was to analyze and evaluate the XTEN technology.  *Id.*; *see id.*, Exh. D ("Second FSA") at 1.  Because of this pre-existing feasibility study, Roche was initially excluded from the scope of the 2016 Advisory Agreement.  Compl. ¶ 14.  However, because Amunix and Roche were unsuccessful at entering into a deal on their own, the parties expanded the scope of the 2016 Advisory Agreement to remove Roche as an excluded party.  *Id.* ¶ 16.

Both the First FSA and the 2016 Advisory Agreement expired in 2017, *id.* ¶¶ 19, 20, at which point Amunix had not yet secured a deal with Roche.  Around November 2017, Amunix—with Geller's assistance—and Roche began negotiating a new feasibility study agreement.  *Id.* ¶ 21.  In February 2018, Amunix and Geller entered into a second advisory agreement with an effective date of August 25, 2017, the day the parties' 2016 Advisory Agreement ended, to prevent any gaps in Geller's retention period.  *Id.* ¶¶ 22-23, Exh. A ("2018 Advisory Agreement").  The stated objective of the 2018 Advisory Agreement was "to exploit [Amunix's] technology platforms to the fullest through a series of Transactions with the pharmaceutical industry."  2018 Advisory Agreement § 1(c).  Under the 2018 Advisory Agreement, Geller was to provide Amunix with financial and market related advice and assistance, including "analyzing, structuring, negotiating, and effecting a proposed Transaction in cooperation with [Amunix]."  *Id.*  The 2018 Advisory Agreement defined the term "Transaction" as, "whether effected directly or indirectly or in one transaction or a series of transactions, entering into a partnering, collaboration or licensing agreement between [Amunix] and another company except any company listed on Annex A."  *Id.* § 1(b).  Roche was not listed on Annex A, *id.* at 8, meaning that a Transaction with Roche could have been within the scope of the 2018 Advisory Agreement.

In consideration for its services, Amunix was to pay Geller a retainer fee of $12,000 per month as well as a "Transaction Fee" owed "at the Financial Closing of a Transaction," which would "further include all Transaction Consideration received by [Amunix] subsequent to the Financial Closing resulting from such Transaction."  *Id.* § 2(b).  The Transaction Fee, also referred to by the parties as a "success fee," ranged from four percent to five percent of the Transaction Consideration for each Transaction "to close during the Engagement Period," depending on the total number of Transactions closed during such period.  *Id.*  The Advisory Agreement defined

"Financial Closing" and "Transaction Consideration" as follows:

> "Financial Closing" shall mean the closing of a Transaction and receipt by [Amunix] of Transaction Consideration (as defined below) in connection therewith . . . . "Transaction Consideration" means cash consideration received by [Amunix] in connection with a Transaction for up-front payments, milestone payments, diligence extension payments, joint venture or collaboration payments, but, in each case, shall exclude royalty payments, and payments made to expressly support research of FTE payments, payments made expressly for the creation of research of clinical materials and other such payments received by [Amunix] in direct support of research and development expenses or deliverables or legal activities.

*Id.* § 2(c).  Further, Amunix was to pay Geller four percent of "all Transaction Consideration received from any Transaction that close[d] during the Tail [Period]."  *Id.* § 2(b)(v).  The "Tail Period" was the twelve-month period following the expiration or termination of the Advisory Agreement.  *Id.* § 1(a).

The negotiations between Amunix—with Geller negotiating on its behalf—and Roche were successful, culminating in a new feasibility study agreement, the Second FSA, dated March 29, 2018.  Compl. ¶ 31; Second FSA.  The Second FSA noted that ████████████████████ ██████████████████████████████████████████████████████████ Pursuant to the Second FSA, ████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████

Even though the Second FSA ██████████████████████████████████ it laid out the conditions under which Amunix and Roche ████████████████████ ██████████████████████ During the study, ████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████

The Second FSA also ████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

Amunix terminated the 2018 Advisory Agreement with Geller, effective November 9, 2018, due to a change of control at Amunix.  Compl. ¶¶ 45-46.  Geller's Tail Period thus lasted until November 9, 2019.  *Id.* ¶ 47; 2018 Advisory Agreement § 1(a).  In or around July 2019, about eight months after Geller's termination and four months prior to the expiration of the Tail Period, Amunix and Roche began negotiations for a licensing agreement.  Compl. ¶¶ 50, 71.  According to the Complaint, the terms of the resulting licensing agreement (the "Licensing Agreement") were substantially complete before the expiration of the Tail Period, but the parties mutually extended the negotiation period by approximately two months.  *Id.* ¶¶ 70, 71.

Then, on January 10, 2020, after the Tail Period ended, Amunix announced in a press

release that it had entered into the Licensing Agreement.  *Id.* ¶¶ 48-49; Jan. 10, 2020 Press Release.

Under the terms of the Licensing Agreement, Roche agreed to make a $40 million upfront payment

and up to an additional $1.5 billion in future milestone payments to Amunix.  Compl. ¶¶ 48-49;

Jan. 10, 2020 Press Release.  Amunix acknowledged that the Licensing Agreement "builds upon

Amunix's previous technology assessment with Roche focused on using XTEN."  Compl. ¶ 48;

Jan. 10, 2020 Press Release.

Geller requested a success fee stemming from the signing of the Licensing Agreement, but

Amunix refused to make the payment.  Compl. ¶ 52.

## B.  Procedural History

On June 22, 2020, Geller commenced this action, alleging breach of contract and, in the

alternative, breach of the implied covenant of good faith and fair dealing, and requesting

declaratory relief from the Court.  *Id.* ¶¶ 55-79.  First, Geller argues that Amunix breached the

2018 Advisory Agreement by declining to pay Geller a success fee when the Licensing Agreement

closed, on the basis that the Second FSA and the Licensing Agreement were part of the same

"Transaction."  *Id.* ¶¶ 55-63.  Second, Geller argues that Amunix breached the covenant of good

faith and fair dealing by intentionally waiting after until the end of the Tail Period to close the

Licensing Agreement.  *Id.* ¶¶ 64-74.  Geller also seeks a judicial declaration with respect to its

rights under the 2018 Advisory Agreement.  *Id.* ¶¶ 75-79.

This case was originally assigned to the Honorable Katherine Polk Failla.  Amunix moved

to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Dkt.

29, and, at Amunix's request, Judge Failla stayed discovery pending resolution of the motion to

dismiss, Dkt. 27.  This case was reassigned to the undersigned on October 8, 2020.  Dkt. 32.  The

Court held oral argument on the motion to dismiss on August 18, 2021.

## II. Legal Standard

For a complaint to survive a Rule 12(b)(6) motion to dismiss, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although the Court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro v. Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015), that tenet "'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice,'" *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (alteration in original) (quoting *Iqbal*, 556 U.S. 687).

## III. Discussion

Amunix moves to dismiss both counts of the Complaint. First, Amunix argues that it did not breach the 2018 Advisory Agreement because the Licensing Agreement and the Second FSA were not the same "Transaction," and because the Licensing Agreement "closed" after the end of the Tail Period. Second, Amunix argues that it did not breach the covenant of good faith and fair dealing because, as a matter of law, waiting to close the Licensing Agreement to avoid paying Geller a success fee does not constitute a breach of the covenant. The Court addresses each argument in turn.

### A. Geller's Breach of Contract Claim

New York substantive law applies to this dispute because the 2018 Advisory Agreement

contains a New York choice-of-law provision, 2018 Advisory Agreement § 7, and both parties apply New York law in their briefs, *see Texaco A/S v. Com. Ins. Co.*, 160 F.3d 124, 128 (2d Cir. 1998) ("[W]here the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry." (quoting *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997))).  Under New York law, to make out a viable claim for breach of contract, a "complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (quoting *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996)).

In assessing whether there was a breach, a court must determine if "the contract is unambiguous." *L. Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010) (quoting *Int'l Multifoods Corp. v. Com. Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002)). This "is a question of law for the court" to decide. *Id.*  "[I]f a contract is unambiguous on its face, its proper construction is [also] a question of law." *Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 89 (2d Cir. 2013) (quoting *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990)).

A contract is ambiguous if its terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Yakin v. Tyler Hill Corp.*, 566 F.3d 72, 75 (2d Cir. 2009) (quoting *Morgan Stanley Grp. Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000)).  Conversely, a contract is unambiguous if it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which

there is no reasonable basis for a difference of opinion." *Steiner v. Lewmar, Inc.*, 816 F.3d 26, 32 (2d Cir. 2016) (alteration in original) (quoting *Goodheart Clothing Co. v. Laura Goodman Enters., Inc.*, 962 F.2d 268, 272 (2d Cir. 1992)).  A court "should not find the contract ambiguous where the interpretation urged by one party would 'strain[] the contract language beyond its reasonable and ordinary meaning.'" *L. Debenture Tr. Co. of N.Y.*, 595 F.3d at 467 (alteration in original) (quoting *Bethlehem Steel Co. v. Turner Constr. Co.,* 2 N.Y.2d 456, 459 (1957)).

Contracts are interpreted as a whole, and interpretations that render provisions of a contract superfluous or meaningless are disfavored.  *See Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) ("Under New York law an interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.'" (quoting *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 27 (2d Cir. 1988))).  Because "agreements are construed in accord with the parties' intent," *Eternity Glob. Master Fund Ltd.*, 375 F.3d at 177 (quoting *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569 (2002)), and because the "best evidence of what parties to a written agreement intend is what they say in their writing," a contract that is "clear and unambiguous on its face" must be interpreted in accordance with "the plain meaning of its terms," *L. Debenture Tr. Co. of N.Y.*, 595 F.3d at 467 (quoting *Greenfield*, 98 N.Y.2d at 569).

### 1. The Meaning of "Transaction"

The parties dispute the scope of the "Transaction" at issue.  Geller would only be paid for a "Transaction" that "close[d] during the engagement period" or "the Tail [Period]."  2018 Advisory Agreement § 2(b).  The 2018 Advisory Agreement defined a "Transaction" as, "whether effected directly or indirectly or in one transaction or a series of transactions, entering into a partnering, collaboration, or licensing agreement."  *Id.* § 1(b); *see* Compl. ¶ 59.  Geller attempts to

bring the Licensing Agreement into the engagement period, arguing that the Second FSA and the Licensing Agreement were a "single collaborative agreement," *i.e.*, a "series of transactions" constituting a single "Transaction." Dkt. 35 ("Opposition") at 8-9. In moving to dismiss, Amunix contends the Licensing Agreement was a single "Transaction" that cannot reasonably be read as constituting part of a series of transactions that included the Second FSA. Dkt. 30 ("Motion") at 7-9.

"Under New York law, all writings which form part of a single transaction and are designed to effectuate the same purpose are to be read together, even though they were executed on different dates and were not all between the same parties." *This Is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998). "Generally, separate writings are construed as one agreement if they relate to the same subject matter and are executed simultaneously." *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 53 (2d Cir. 1993). "Even if the writings are executed at different times, however, . . . [the writings] should be interpreted together if the parties assented to all the promises as a whole, so that there would have been no bargain whatever if any promise or set of promises had been stricken." *Id.* (internal quotation marks omitted).

To support its reading of a "series of transactions," Geller leans on *TVT Records v. Island Def Jam Music Group*, 412 F.3d 82 (2d Cir. 2005), in which the Second Circuit outlined the test under New York law for determining whether multiple writings constitute one agreement. Opposition at 9, 13. There, the Second Circuit reiterated that, as made clear by such authorities as *This is Me* and *Commander Oil*, whether contracts should be viewed as one agreement depends upon the intent of the parties. *TVT Records*, 412 F.3d at 89. The legally operative question is "whether the contracts were part of a single transaction intended to effectuate the same purpose." *Id.* at 90. In *TVT Records*, the Second Circuit found two contracts executed by different parties

on different days to be one agreement because: (1) they both "were intended to effectuate the same result"; (2) the second contract required the parties to "honor all of the terms and conditions set forth in the [first]"; (3) the first contract "expressly contemplated the [defendant's] eventual participation in the project"; (4) the second contract "modified the profit distribution formula in the [first]"; and finally (5) "the [second contract] is meaningless without the [first]." *Id.* at 89.  The Second Circuit clarified that although the question of whether multiple writings should be construed as one agreement is "typically a question of fact for the jury," "if the documents in question reflect no ambiguity as to whether they should be read as a single contract, the question is a matter of law for the court." *Id.*

Unlike the contracts at issue in *TVT Records*, the Second FSA and the Licensing Agreement were not intended "to effectuate the same purpose." *Id.* at 90.  First, and most importantly, the agreements were not designed to "effectuate the same result." *Id.* at 89.  The Second FSA was designed to ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ████████████████ The Licensing Agreement was, of course, a license for Roche to use the XTEN technology.  *See* Jan. 10, 2020 Press Release.  In arguing that the contracts constituted one agreement, Geller focuses on the parties' long-term objectives, arguing that the Licensing Agreement "was the clearly contemplated end goal of[] the Second FSA" and "both transactions were aimed at achieving the same goal—Roche's licensing of Amunix's XTEN product." Opposition at 9.  But even if the parties entered into certain contracts in pursuit of one ultimate goal, that does not transform every agreement in pursuit of that goal into one agreement.

And the Complaint is devoid of any allegations regarding the other considerations the Second Circuit outlined in *TVT Records*.  For instance, Geller does not allege the Licensing

Agreement would be meaningless without the incorporation of the Second FSA, or that the Licensing Agreement modified or required either party to honor the terms set out in the Second FSA.  This is therefore quite unlike other cases in which the Second Circuit has found multiple contracts to constitute a single agreement such that the contracts should be read as one.  *See, e.g.*, *Genger v. Genger*, 663 F. App'x 44, 48 (2d Cir. 2016) (affirming the district court's finding that two contracts—the plaintiff's agreement to pay a third party for stock and a separate agreement whereby the defendant agreed to indemnify the plaintiff for half of such payments—formed an integrated agreement because they created a joint obligation to repay the third party and the indemnity would be meaningless without the other agreement); *Karmely v. Wertheimer*, 737 F.3d 197, 207 (2d Cir. 2013) (concluding that multiple agreements, including an operating agreement, loan agreement promissory note, and intercreditor agreement, "should be construed together" because they were "all executed on the same date . . . and relate to the same real estate development"); *This Is Me, Inc.*, 157 F.3d at 145 (finding that a jury was justified in reading the various agreements at issue as an integrated agreement, since they "all relate to a single transaction: [the defendant's] services as an actor in [a Broadway production]," were "executed more or less concurrently," one contract "expressly state[d] that the two contracts were intended to be executed together," and the defendant's attorney conceded that the contracts "were intended to be read together to define the parties' relationship").  Accordingly, although Amunix may have hoped the Second FSA would lead to the Licensing Agreement—just as it had hoped the *First* FSA would have led to a licensing agreement—Geller has not alleged any facts suggesting that the Second FSA and the Licensing Agreement were "intended as a single agreement."  *TVT Records*, 412 F.3d at 90.

    During oral argument, Geller attempted to distance itself from *TVT Records*, asserting that

*TVT Records* does not govern because the contracts there did not have "the series language" that is in the 2018 Advisory Agreement, *i.e.*, defining a "Transaction" to include a "series of transactions," and because "[t]here is nothing in [the 2018 Advisory Agreement] that requires two [transactions] that make up a series to be the same."  *See* Aug. 18, 2021 Tr. at 24:10-20.  But in opposition to the motion to dismiss, Geller, relying on *TVT Records*, explicitly argued that the Second FSA and the Licensing Agreement were "the same single collaborative agreement—a 'Transaction.'"  Opposition at 9; *see also id.* at 13.  And while ultimately unconvincing, this was not an unreasonable argument, since the Second Circuit has made clear that, "[u]nder New York law, all writings forming part of a single *transaction* are to be read together."  *This Is Me, Inc.*, 157 F.3d at 143 (emphasis added).

But even setting *TVT Records* aside, it is clear that the Second FSA and the Licensing Agreement were not a "series of transactions" constituting a single "Transaction" under the 2018 Advisory Agreement.  Geller's theory, at least in its opposition brief, is that it was entitled to a fee because the Second FSA, "a 'partnering' or 'collaboration' agreement between Amunix and Roche," closed during the engagement period, and the Second FSA and the Licensing Agreement were "the same single collaborative agreement."  Opposition at 8-9.[1]

In attempting to link the agreements, Geller makes two main arguments.  First, Geller

---

[1] Geller raised a slightly new theory during oral argument—that a "transaction" in a "series of transactions" need not be a "partnering," "collaboration," or "licensing" agreement at all and that the resulting Transaction need not be "a licensing agreement Transaction."  Aug. 18, 2021 Tr. at 25:22-27:13.  Instead, Geller suggested that there need only be one amorphous "Transaction," made up of smaller transactions of any sort that "ultimately culminate in one of those" specific types of agreements.  *Id.*  It is well-settled that a party cannot raise new arguments during oral argument.  *See Saray Dokum Ve Madeni Aksam Sanayi Turizm A.S. v. MTS Logistics, Inc.*, No. 17 Civ. 7495 (JPC), 2021 WL 1199470, at *7 (S.D.N.Y. Mar. 30, 2021) (collecting cases).  Regardless, any new arguments do not change the calculus here, as the two agreements cannot be interpreted to constitute one Transaction.

argues the Licensing Agreement "was the same as and a continuation of" the Second FSA because the Second FSA "created the necessary groundwork" for the Licensing Agreement, Opposition at 11, and the Licensing Agreement was ultimately negotiated pursuant to the framework set out in the Second FSA, Compl. ¶ 44.  Geller thus contends that "[p]ayments made pursuant to the License Agreement were not part of a 'new' agreement but rather were payments made as part of, and anticipated by, the Second FSA, from which [Geller] was entitled to a success fee under the 2018 Advisory Agreement."  Opposition at 7.

But while the Second FSA may have included ███████████████████████ ████████████████ the Licensing Agreement Amunix and Roche eventually entered into was undoubtably a separate, distinct Transaction.   The Second FSA ██████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ███████████████████ Geller makes much of the contractual provision requiring that, █ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ Geller claims ████████████ultimately motivated Roche to enter into the Licensing Agreement, ██████████████████████████████████████████████████ ████████████ But ██████████████████████████████████████ ████████did not fuse the two agreements into a series of transactions that effectuated a single "Transaction" of "entering into a . . . collaboration . . . agreement."

Second, Geller contends the Second FSA and the Licensing Agreement were a "series of transactions" because the Second FSA ████████████████████████████████████

14



Specifically, the Second FSA required Roche to ██████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████ But as much as

Geller attempts to argue otherwise, this provision cannot be read to set the terms of the eventual

Licensing Agreement.  Rather, this clause spelled out ████████████████████████

██████████████████████████████ In fact, the Second FSA expressly provided that ██

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

██████████████

Geller argues that, at a minimum, the term "Transaction" is ambiguous and must go to a

jury.  *See* Opposition at 12-14.  Geller cites *RGC, LLC v. American Broadband Communications,*

*LLC*, No. 11 Civ. 257 (LTS), 2011 WL 2162974 (S.D.N.Y. May 31, 2011), for the proposition

that "courts have denied motions to dismiss where the use of the term 'Transaction' was

'ambiguous, insofar as the Contract defined "Transaction" as "one or a series of transactions."'"

Opposition at 13 (quoting *RGC, LLC*, 2011 WL 2162974, at *3).  But even a cursory reading of

*RGC* shows that it is distinguishable from the facts here.  There, the contract at issue terminated

on "the earlier of (i) the date on which a Transaction is consummated, or (ii) the date on which this

Agreement is otherwise terminated via written notice," and the contract defined the term

"Transaction" as "one or a series of transactions."  *RGC, LLC*, 2011 WL 2162974, at *1.  The

defendant attempted to argue that the parties' contract terminated when the plaintiff closed a

preliminary deal.  *Id.* at *4.  The court found the term "Transaction" to be "at best ambiguous, . . .

particularly in light of [the plaintiff's] allegations of bilateral performance consistent with the

continued existence of the Contract" for three years after the first deal closed. *Id.* at *1-2, 4. This situation is wholly distinguishable from the instant case, where the contractual language clearly shows that the two agreements were not intended to be considered one "Transaction" and the parties' bilateral actions do not show any interpretation inconsistent with the plain meaning of the text.

In sum, Geller has not shown there is any ambiguity as to whether the Second FSA and the Licensing Agreement should be read as a single Transaction, and the Court will not read in ambiguity simply because this is a motion to dismiss. There is no reasonable way to find that the parties entered into a single collaboration agreement via a "series of transactions" that included both the Second FSA and the Licensing Agreement. Although Geller contends that interpreting these two agreements to be separate Transactions would render the definition of "Transaction" meaningless, Opposition at 9, the "series of transactions" provision could still cover a circumstance where an agreement, such as a licensing agreement, was executed via several distinct agreements or was amended over time. *See, e.g.*, 2018 Advisory Agreement ¶ 6 (addressing a separate indemnification agreement attached to and incorporated by reference into the 2018 Advisory Agreement); *cf. Gerszberg v. Iconix Brand Grp.*, No. 17 Civ. 8421 (KBF), 2018 WL 2108239, at *2 (S.D.N.Y. May 7, 2018) (discussing a "series of transactions" extending and amending a licensing agreement). Here, the Licensing Agreement was not "effected . . . [in] a series of transactions," and any "collaboration agreement" that Amunix and Geller may have entered into with the Second FSA cannot be read to cover the Licensing Agreement.

## 2. When the Transaction "Closed"

Amunix argues that, even if the Second FSA and the Licensing Agreement were part of a "series of transactions," any "Transaction" that included the Licensing Agreement did not "close"

during the Engagement or Tail Periods.  Motion at 7.  The Advisory Agreement stated that Amunix would pay the Transaction Fee to Geller "at the Financial Closing of a Transaction, in cash, and to further include all Transaction Consideration received by [Amunix] subsequent to the Financial Closing resulting from such Transaction," so long as the "Transaction" "close[d] during the engagement period" or "close[d] during the Tail [Period]."  2018 Advisory Agreement § 2(b).  The Advisory Agreement further defined a "Financial Closing" as "the closing of a Transaction and receipt by [Amunix] of Transaction Consideration . . . in connection therewith."  *Id.* § 2(c).

Geller responds that "the plain terms of the 2018 Advisory Agreement do not require that the [Licensing] Agreement also close during the Engagement Period to be considered part of 'a series of transactions.'"  Opposition at 9.  Geller thus asks the Court to find that the Transaction closed when the Second FSA closed, since the Second FSA ███████████████████████████ ████████████████████████  Geller further contends that the fact the Licensing Agreement was signed after the Tail Period closed is "irrelevant," since the 2018 Advisory Agreement allowed Geller to earn a fee on payments made "subsequent to the Financial Closing" of a Transaction.  *Id.* at 11.

Geller's reading "strain[s] the contract language beyond its reasonable and ordinary meaning."  *Bethlehem Steel Co.,* 2 N.Y.2d at 459.  Under the plain language of the 2018 Advisory Agreement, a "Transaction"—not a "transaction" in a series that will eventually make up a broader "Transaction"—must close during the Tail Period.  Geller argues that the Licensing Agreement "was the clearly contemplated *end goal* of[] the Second FSA" and that "both transactions were aimed at achieving . . . Roche's licensing of Amunix's XTEN product."  Opposition at 9 (emphasis added).  Yet Geller asks the Court to find that the Transaction closed in 2018, years before Amunix and Roche began negotiating, let alone entered into, the Licensing Agreement.  Geller's reading

defies the plain language of the 2018 Advisory Agreement, which made clear that a "Transaction" is "*entering into* a partnering, collaboration or licensing agreement."  2018 Advisory Agreement § 1(b) (emphasis added).  The Court will not perform contractual gymnastics to interpret an earlier feasibility study as marking the "closing" of a Transaction for entering into a licensing agreement.

Geller tries to skirt the plain language of the 2018 Advisory Agreement by emphasizing that the Second FSA ███████████████████████████████████████████ ████████████████   In support, Geller cites to New York case law allowing a broker to earn a commission if the broker can "at least show that he created an amicable atmosphere in which negotiations went forward or that he generated a chain of circumstances which proximately led to the sale."  *SPRE Realty, Ltd. v. Dienst*, 986 N.Y.S.2d 92, 98 (App. Div. 2014) (citation omitted).  But that only happens "[i]n the absence of an agreement to the contrary."  *Id.* at 97  Here, the parties did have an agreement:  The "Transaction" had to "close" within the time period set out in the contract for Geller to obtain a fee.  If this did not happen, Geller was not owed a fee, even if its early actions contributed to that Transaction ultimately closing.

Geller's reliance on the language in the 2018 Advisory Agreement entitling Geller to funds paid "subsequent" to the close of a Transaction does not change this.  Geller argues that "[t]his provision contemplated this exact situation and was aimed at protecting [Geller]—where [Geller] worked diligently to close a deal, but the consideration pursuant to which [Geller]'s success fee would be calculated was paid at a later time, [Geller] would nonetheless be compensated for the work it already contributed."  Opposition at 11.  But while this provision would have allowed Geller to recoup a later payment, such as a milestone payment, it simply did not extend the time for a Transaction to close.

This was a contract between two sophisticated parties.  Had Geller wanted to be

compensated for every agreement it entered into—beyond, of course the $12,000 per month retainer fee—it could have insisted on such a provision in the contract.  It did not.  Instead, Geller entered into a contract that only allowed it to receive a success fee if the Transaction closed within a set time period, and any Transaction that can reasonably be read to include the Licensing Agreement did not close within that period.  Accordingly, Geller is not owed a fee in connection with that agreement.

## B.  Geller's Breach of the Implied Covenant of Good Faith and Fair Dealing Claim

In the alternative, Geller alleges that Amunix breached the implied covenant of good faith and fair dealing by deliberately delaying the execution of the Licensing Agreement in order "to avoid Amunix's obligation to pay [Geller] its significant success fee" owed under the 2018 Advisory Agreement.  Compl. ¶ 72.

Under New York law, "[i]mplicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance."  *Woodard v. Reliance Worldwide Corp.*, No. 18 Civ. 9058 (RA), 2019 WL 3288152, at *2 (S.D.N.Y. July 22, 2019) (alteration in original) (quoting *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995)), *aff'd,* 819 F. App'x 48 (2d Cir. 2020).  "A breach of the covenant is considered a breach of the underlying contract."  *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 817 (2d Cir. 2014).  Pursuant to this covenant, "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *Moran v. Erk*, 11 N.Y.3d 452, 456 (2008) (quoting *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002)).  In order to constitute a breach of the implied covenant, a party's action must have "directly violate[d] an obligation that may be presumed to have been intended by the parties."  *Gaia House Mezz LLC*, 720 F.3d at 93 (quoting *Thyroff v. Nationwide Mut. Ins. Co.,* 460 F.3d 400, 407-08 (2d Cir. 2006)).  The implied

covenant, however, does not go so far as to "undermine a party's 'general right to act on its own interests in a way that may incidentally lessen' the other party's expected benefit." *Sec. Plans, Inc.*, 769 F.3d at 817 (quoting *M/A–COM Sec. Corp. v. Galesi,* 904 F.2d 134, 136 (2d Cir. 1990)).

To successfully state a cause of action alleging breach of the implied covenant, a party must "allege facts which tend to show that the defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff." *Fillmore E. BS Fin. Subsidiary LLC v. Capmark Bank*, 552 F. App'x 13, 16 (2d Cir. 2014) (quoting *Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Com.,* 697 N.Y.S.2d 128, 130 (App. Div. 1999)); *accord Dweck L. Firm, L.L.P. v. Mann*, 340 F. Supp. 2d 353, 358 (S.D.N.Y. 2004). A party cannot solely rely on conclusory allegations of the defendant's failure to act in good faith; "specific factual allegations of a party's bad faith acts are required." *Ferguson v. Lion Holding, Inc.*, 478 F. Supp. 2d 455, 469 (S.D.N.Y. 2007) (citing *Prospect St. Ventures I, LLC v. Eclipsys Sols. Corp.*, 804 N.Y.S.2d 301, 302 (2005)), *clarified on denial of reconsideration,* No. 02 Civ. 4258 (PKL), 2007 WL 2265579 (S.D.N.Y. Aug. 6, 2007).

Even if the Court were to accept that Amunix purposefully delayed the execution of the Licensing Agreement to avoid paying Geller a fee, such action would not, as a matter of law, constitute a breach of the implied covenant of good faith and fair dealing. The contract conditioned Geller's success fee on a Transaction closing during the Engagement or Tail Period. *See* 2018 Advisory Agreement § 2(b). Geller argues that Amunix *could have* closed the Transaction earlier and instead used "the timelines secured by [Geller]" in the Second FSA to extend the negotiation period. Opposition at 17. This delay was not "unusually long" or "significant," but nonetheless worked to Geller's detriment. *Id.*

But Geller's own allegations make clear that Amunix did not "directly violate an obligation

that may be presumed to have been intended by the parties." *Gaia House Mezz LLC*, 720 F.3d at 93.  Geller only had a contractual right to be paid if the Transaction closed within a certain period of time.  Geller did not have a contractual right to be paid when a Transaction could have closed or when the Transaction's terms were substantially complete.  In other words, Geller's expectations were conditioned on the Transaction actually closing within a set period of time.  The Court therefore cannot "presume[]" that the parties intended for Geller to receive a fee in such a case.  *Id.*

Other courts have held similarly.  For instance, in *Woodard v. Reliance Worldwide Corporation*, the plaintiff's employment contract provided that he would be paid a special bonus if he was terminated within seven days of his employer's acquisition.  2019 WL 3288152, at *1.  The plaintiff was terminated twenty-nine days after the acquisition, allegedly so that his employer would not have to pay him the bonus, so he sued his employer for breaching the implied covenant.  *Id.* at *1-3.  The court dismissed the claim because the plaintiff was not "deprived of anything to which he was entitled, or to which he reasonably could have expected to be entitled, under the [contract]."  *Id.* at *3 (internal quotation marks omitted).  The contract in that case "sp[oke] not of the timing of Defendant's intentions [to terminate the plaintiff], but rather the timing of Plaintiff's termination."  *Id.*  The Second Circuit affirmed via summary order, highlighting that "[t]he provision at issue concerns the timing of [the plaintiff's] termination in the event of an acquisition, not the timing of the decision to terminate him."  *Woodard*, 819 F. App'x at 49.  The court explained that the plaintiff "bargained for special financial protection for the seven-day window following an acquisition."  *Id.*  Therefore, allowing his claim to go forward "would undo the contract's terms and create an independent contractual right that was never negotiated by the parties."  *Id.*

Geller attempts to distinguish *Woodard* on the basis that "Amunix intentionally vitiated the core of the 2018 Advisory Agreement and 'depriv[ed] Geller of the benefit of the bargain.'" Opposition at 17 (quoting *Dreni v. PrinterOn Am. Corp.*, 486 F. Supp. 3d 712, 731 (S.D.N.Y. 2020)).  But *Woodard* did not hinge on whether the payment went to the "core" of the bargain; it was based on the parties' expectations.  The contract in *Woodard* conditioned a payment on the event that something happened within a certain timeline.  That did not occur, and thus the employee could not expect to be paid.  This is thus distinguishable from, for instance, terminating an employee without cause only to avoid paying that employee promised compensation.  *See Parneros v. Barnes & Noble, Inc.*, No. 18 Civ. 7834 (MKV), 2020 WL 5350531, at *8 (S.D.N.Y. Sept. 3, 2020) (distinguishing *Woodard* on the basis that "the parties [in *Woodard*] specifically negotiated a contract that provided a bonus if, and only if, the plaintiff were terminated within seven days of an acquisition," whereas the plaintiff in *Parneros*, who alleged his employer "intentionally time[d] his termination to avoid triggering payment obligations," had a contract that "did not tie [the plaintiff's] equity to the *timing* of his termination").

Also instructive is the Appellate Division's decision in *Phoenix Capital Investments LLC v. Ellington Management Group, L.L.C.*, 859 N.Y.S.2d 46 (App. Div. 2008).  *See Entron, Inc. v. Affiliated FM Ins. Co.*, 749 F.2d 127, 132 (2d Cir. 1984) ("[T]he decision of an intermediate state court on a question of state law is binding on [a diversity court] unless we find persuasive evidence that the highest state court would reach a different conclusion.").  In *Phoenix*, the court examined a factual scenario strikingly similar to the one before this Court.  The plaintiff and the defendant had entered into an agreement by which the plaintiff was entitled to a fee for connecting the defendant to investors.  *Phoenix Cap. Invs. LLC*, 859 N.Y.S.2d at 48.  The plaintiff alleged breach of the implied covenant in connection with a prospective investor, which the plaintiff claimed to

have introduced to the defendant and which invested after the tail period of the agreement had expired. *Id.* The plaintiff alleged that the defendant caused this investor "to purposely delay its investment until after the lapse of the one-year tail period, so as to impede plaintiff's recovery of its fee." *Id.* The court found that the plaintiff did not state a claim, because the defendant, "in terminating its agreement with plaintiff, acted entirely within the agreement termination provision." *Id.* It further explained that the plaintiff "actively negotiated the tail provision, with all its risks and benefits to both parties, and cannot nullify that provision on the basis of a bare allegation that defendant acted unfairly, both in terminating the agreement and in exercising its rights pursuant to the tail provision." *Id.*

Geller calls this case "irrelevant, inapposite and not instructive" because "the *only* deal at issue" closed after the tail period. Opposition at 12. But for the reasons outlined above, here too there was only one Transaction, and even if there were a series of transactions that made up that Transaction, the Transaction did not "close" within the Tail Period. Geller also contends that *Phoenix* is distinguishable since the delay in that case was two years whereas "there was no unusually long or significant delay in entering into the [Licensing] Agreement." Opposition at 17. But there is no indication the length of delay was relevant to the court's decision in *Phoenix*.

Indeed, Geller's allegations that the delay was not "unusually long" and the Licensing Agreement "was achieved directly through the timelines secured by [Geller]," *id.*, do little to support its claim. These allegations only emphasize that Amunix acted within its contractual rights. Amunix "did not violate the implied covenant of good faith and fair dealing merely by acting in its own self-interest while also performing its express obligations under the contract." *Woodard*, 2019 WL 3288152, at *3. The condition that would have resulted in a payment to Geller did not materialize, meaning that Geller was not "deprived of anything to which [it] was entitled."

*Id.*  Thus, even assuming Amunix delayed the payment, Amunix did not breach the implied covenant of good faith and fair dealing here.

## C.  Geller's Request for Declaratory Relief

Geller also has asked this Court for a declaration "that Geller is entitled to a success fee of five percent (5%) of any future payments from Roche to Amunix under the [Licensing] Agreement that fall within the 2018 Advisory Agreement's definition of Transaction Consideration."  Compl. ¶ 87.  Geller claims "[a] judicial declaration is necessary and appropriate at this time under the circumstances so that Geller may ascertain its rights under the 2018 Advisory Agreement and so the parties' future conduct shall conform to those rights."  *Id.* ¶ 79.

It is well-settled that the Declaratory Judgment Act, 28 U.S.C. § 2201, "provides a federal remedy, but does not provide any basis for a federal claim in cases in which there is no independent basis for exercising federal subject matter jurisdiction." *Universal Processing LLC v. Weile Zhuang*, No. 17 Civ. 10210 (LTS), 2018 WL 4684115, at *4 (S.D.N.Y. Sept. 28, 2018).  Accordingly, because the Court dismisses Geller's other two causes of action, there is "no other viable basis for federal jurisdiction or substantive relief under federal law," and the cause of action for declaratory relief must be dismissed.  *Id.*

## IV.  Conclusion

For the aforementioned reasons, Amunix's motion to dismiss is granted.  The Clerk of the Court is respectfully directed to terminate all pending motions and close this case.

This Opinion and Order shall initially be filed under seal.  The parties shall have until September 13, 2021 to file any proposed redactions to this Opinion and Order, as well as a letter justifying why these redactions are justified under *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006).  The parties shall submit a single set of proposed redactions, but may explain

any disagreements in their joint letter.

       SO ORDERED.

Dated: August 31, 2021
      New York, New York

                                      JOHN P. CRONAN
                           United States District Judge